BAILES, Judge.
This tort action arose out of two collisions involving three automobiles on the bridge spanning the Mississippi River between West Baton Rouge and East Baton Rouge Parishes at 1:45 o’clock on the morning of November 16, 1963. The plaintiff, a minor at the time of the accident but who reached majority prior to the filing of this suit, was a guest passenger in the automobile to be herein referred to as vehicle No. 2. The defendants are Sherman J. Provost, owner and operator of a 1958 Ford automobile, hereinafter referred to as vehicle No. 1; Joseph J. Fontenot, operator of a 1962 white Falcon automobile, being the one above referred to as vehicle No. 2; *909 and Lawrence S. Womack, operator of a 1962 green Falcon automobile, hereinafter referred to as vehicle No. 3. This latter vehicle was insured under a public liability-policy issued by State Farm Mutual Automobile Insurance Company, who also is a defendant herein.
The Allstate Insurance Company was erroneously made a defendant herein as the public liability insurer of vehicle No. 2. Upon determining Allstate Insurance Company was not such insurer, plaintiff secured the dismissal of Allstate from this litigation.
After trial of this matter, the lower court rendered judgment in favor of plaintiff and against defendants, Provost and Fontenot, in solido, in the amount of $8,179.30. The other defendants were dismissed. Only the plaintiff has appealed.
The highway which traverses the Mississippi River via the bridge in question is U. S. Highway 190. The bridge is large and high, providing four lanes for vehicular travel, being two lanes for west bound traffic and two lanes for east bound traffic separated in the middle by a single railroad track. The evidence shows vehicular traffic lanes of this bridge are several hundred feet above the waters of the Mississippi River, and that the bridge is approximately one (1) mile in length. From ground level there is an incline for about one-fourth mile in length on either side, and a flat, level portion about one-half mile in length. The speed limit on this bridge is SO mph. The road was dry and the night was clear. No lights of any kind are affixed to or illuminate this bridge.
The State troopers who investigated this accident testified the accidents occurred about 200 feet east of the west end of the level portion of the bridge. This would be 200 feet short of the decline of the traffic lanes traveling west.
The record reflects the following facts about which there is no dispute. The driver of vehicle No. 1 was proceeding west across the bridge in the far right or north traffic lane when his automobile stalled. Immediately he attempted to start his automobile, however his efforts were to no avail. He testified he was unable to get out of his car to flag traffic for at least several minutes because the flow of traffic was so constant it barred his exit. However, there is other convincing testimony which showed traffic at that time of the morning on this particular occasion was very light. At any rate, Provost did nothing to protect traffic approaching the rear of his stalled automobile. While vehicle 1 was in such position, vehicles No. 2 and No. 3 were approaching from the rear. The testimony of both the drivers of vehicle No. 2 and No. 3 is that vehicle No. 2 overtook and passed vehicle No. 3 prior to the time either vehicle reached the bridge. Fontenot testified he was driving a little faster than was Wom-ack, he passed him to the left and then pulled into the right lane ahead of Womack, and that he remained in that traffic lane until an instant before his collision with vehicle No. 1. Womack testified substantially the same, however, he added he was at no time more than two car lengths behind Fontenot. His testimony, in part, is as follows:
Cross-examination by Mr. Brewer. Page 171 of the Record.
“Q. As you were traveling westerly on the highway on this side [meaning the Baton Rouge side of the bridge] do you recall any vehicles passing you ?
A. A white Falcon passed me before I got to the approach of the bridge, but no other traffic passed at the time.
Q. About how fast were you going as you approached the bridge?
A. About 50 or 55, somewhere along in there, I wasn’t going very fast.
*910 Q. Was the white Falcon going very fast?
A. No, sir, he just eased past me.
Q. Which lane of traffic were you in as you went up the bridge?
A. I was in the right lane of traffic, the outside lane.
Q. Did you notice any car in front of you?
A. To my opinion, the white Falcon when it passed it stayed in the left lane I can’t remember really if he got back in the right lane or if he stayed in the left lane, but it seemed like he stayed in the left lane.
Q. What do you base that on ?
A. Memory mostly, just—
Q. Do you remember the white Falcon staying in the left lane, or not?
A. I just can’t remember offhand whether he really stayed in the left lane or moved over into the right lane.”
Mr. Womack further testified on examination by his own counsel, as follows, as found on page 202 of the record:
By Mr. Lane.
“Q. Mr. Womack, when the Fontenot car passed you was there much difference in the speed of the two drivers?
A. No, sir, they were pretty close to the same thing.
Q. I believe you stated that he just eased by you, is that the way you describe it?
A. Yes, sir, he just — the car just gradually came past, not very fast, just came steadily past.
Q. Did he ever get very far ahead of you? Was there ever much difference separating the two cars?
A. No, sir, one car length, two at the most I would say.
* '*'*** *
Q. What was the first notice you had that anything unusual was happening?
A. Well, as I topped the bridge I thought I saw car lights on my side of the road and I swerved to the left and at that time I ran back of Mr. Fontenot’s car.
Q. What time interval elapsed there from the time you saw the car lights ?
A. It was short. It seemed almost the same time.
Q. Did you have time to put on the brakes ?
A. I don’t think I did, I don’t remember doing it, no, sir.
Q. What did you do?
A. I swerved my car and I hit him, that’s the last thing I remember. I hit a car.”
We are convinced Fontenot, driver of vehicle No. 2, after passing vehicle No. 3 prior to reaching the bridge, moved into the right or north lane. As vehicle No. 1 was stalled in the right or north lane, there would have been no reason or cause of contact between vehicle No. 1 and No. 2 had vehicle No. 2 remained in the left lane.
Mr. Fontenot, driver of vehicle No. 2 and in which vehicle plaintiff was a guest passenger, testified:
Page 162 of the Record.
By the Court:
“Q. Where did you pass Mr. Womack, Mr. Fontenot?
A. Before the incline.
Q. Before you got up on the bridge?
A. Right.”
By Mr. Brewer:
“Q. Now, after you passed him, which lane of travel were you in?
A. Right
*911 Q. You went back and got in the right hand lane of traffic?
A. That’s correct
Q. Then what happened?
A. I started up the incline, approximately, I don’t know exactly, maybe 45 or 50, I think it would be closer to 45, and after I reach the level part of the bridge that’s when the collision occurred — and it was unavoidable, I didn’t see any lights or anything. When I did see him I did try to swerve off to the left and miss him, but I couldn’t.
Q. You had your lights on, though, didn’t you?
A. That’s correct.
Q. Did you have them on dim or bright, do you recall?
A. I don’t recall.
Q. About how far from the 1958 Ford was it when you first saw the car there on the bridge?
A. I can’t — it was so close, I mean, I didn’t have time to apply the brakes or anything.
Q. There is a long level ground on top of the bridge, isn’t it?
A. Right. It was right after the incline and I was right on him before I see him.
Q. You hear the trooper’s statement, one of the trooper’s statement, there was approximately half a mile of level ground on top of the bridge, isn’t that substantially correct, there is ?
A. I think it’s correct.
Q. You heard the same trooper also testify that the first accident occurred approximately 200 feet east of the west decline, is that about where the accident occurred ?
* * * * ‡ *
A. I would have thought it was a little closer to the east side than it was to the west side.”
It appears all parties involved in these collisions were rendered unconscious for varied periods of time. Trooper Robinson reconstructed the collisions in this manner. Vehicle No. 1 stalled in the right hand west bound lane next to the outside rail. Vehicle No. 2, traveling in the same lane, upon seeing vehicle No. 1 a moment prior to contact, steered short to the left but not soon enough to avoid contact. The right front of vehicle No. 2 struck the left rear of vehicle No. 1. The right front of vehicle No. 2 was heavily damaged as was also the left rear of the vehicle No. 1. When vehicle No. 2 struck vehicle No. 1 it turned vehicle No. 1 clockwise across both traffic lanes. Vehicle No. 2 then went on past vehicle No. 1 and stopped further to the west. Immediately thereafter, as vehicle No. 3 was next in line behind vehicle No. 2, vehicle No. 3 struck the right side of vehicle No. 1 knocking it further in a clockwise motion with it coming to rest headed or facing to the east. Then, vehicle No. 3 continued on to strike vehicle No. 2 in the rear.
After trial on the merits in the lower court, the trial judge, in assigning oral reasons for judgment, held the first accident was caused by the joint negligence of Provost and Fontenot, in that Provost took no action whatever to protect traffic from the rear and Fontenot was negligent in running into the rear of the Provost car, and in effect the first accident was caused by the joint actionable negligence of these two persons. The Trial Judge absolved Wom-ack of any negligence that was a proximate cause of the second accident for the reason he found Fontenot had just prior to the accident passed Womack and Womack had no opportunity to avert the second collision.
The plaintiff, in his brief, has made eight specific assignments of error in the judg *912 ment of the trial court. These specification of errors may be paraphrased to state the trial court erred in: (1) Failing to find actionable negligence on the part of Wom-ack; and (2) Awarding an inadequate quantum for the injuries suffered by plaintiff.
Thus, as seen above from the assignment of errors, the plaintiff contends this court should find Womack guilty of negligence which was a proximate cause of the second collision, and also increase the amount of the award in favor of plaintiff.
From a reading of the plaintiff’s brief, it is clear the plaintiff argues there was but one collision or accident. It is clear the plaintiff is in error in this assumption. There were two separate and distinct collisions. The first collision involved vehicle No. 1 of Provost and vehicle No. 2 of Fon-tenot, and the second collision, while it did occur in point of time immediately after the first collision, involved vehicles No. 1, 2 and 3. The discussion of the collisions hereinabove more clearly points this out.
There is no reason for this court to determine the question of negligence vel non of Womack for the reason there is no evidence in the record before us to prove plaintiff received any injuries whatever in the second collision. Not only is there no evidence to substantiate plaintiff received injuries in the second accident, the weight of the evidence establishes the contrary.
The treating physician made the following diagnoses of injuries. He found a cerebral concussion, shock, secondary to blood loss, and severe, disfiguring lacerations of the face. In his report, filed in evidence, this doctor stated “[Apparently the patient’s head went through the windshield; * * In a trial held previous to the instant case, in West Baton Rouge Parish involving other parties to this accident, plaintiff testified:
Page 87 of the record.
“Q. Did you notice the Provost vehicle ?
A. No, I didn’t.
Q. Before the collision did you see it at all?
A. No I didn’t see it all before the accident. It seems like I was trying to change the station on the radio or something at the time, because a week or so after the accident, after I got out of the hospital, I went and saw the car we were riding in and it appeared I didn’t hit the windshield right in front of the seat, it was kind of like on the side, like I was tuning in the radio or something.”
Page 89 of the record.
“Q. Were you hurt in the accident?
A. Yes, I was.
Q. What kind of injuries did you receive?
A. Well, I went through the windshield of the car — at least my head went through it and busted out a hole about 2 feet wide in the windshield.
Q. You got some cuts on your face?
A. Yes, sir, the scars you see now.”
On trial of the instant case, plaintiff testified:
Page 178 of the record.
“Q. Were you involved in an automobile accident on November 16, 1963?
A. Yes, sir.
Q. Do you recall anything about that accident, Glenn?
A. No, sir, I don’t remember anything at all about it.”
Page 180 of the record.
“Q. Do you remember the accident at all?
A. I don’t remember ever seeing a car ahead of us, hearing the noise or anything.
*913 Q. You suddenly woke up in the hospital, is that what happened to you?
A. That’s right.
Q. What was the first thing you remember when you woke up ? Do you remember anything at all? About — anything about the accident?
A. No, I can’t. I can remember just before we got to the bridge, maybe on the bridge, I am not sure.”
It is pertinent to note the trooper testified the Provost automobile, vehicle No. 1, was heavily damaged on the left rear and the Fontenot automobile, vehicle No. 2, was heavily damaged on the right front. The contact between these two vehicles was such as would throw the plaintiff into the windshield. This unquestionably supports the conclusion, based on the record before us, the plaintiff sustained his injuries in the first collision.
This brings us to a determination of the correctness of the award of damages in favor of plaintiff. The trial court awarded special damages of $679.30, including hospital bill of $305.30; ambulance, $10; Doctors, $364; and for personal injuries, pain and suffering and permanent disfigurement an award of $7,500 was made, making a total award of $8,179.30.
Dr. Moreland, the physician who treated plaintiff on his admission to Our Lady of the Lake Hospital, in his report stated: “The major injuries involved the lacerations of his face and scalp. The patient’s face and scalp were severly lacerated with multiple lacerations of the nose and right cheek. There was a large laceration extending from the hairline on the left side of the forehead across the forehead to the bridge of the nose, extending across the right upper eyelid involving the right upper eyelashes laterally extending to the corner of the right eye, laterally, then extending posteriorly toward the right ear. The right eyelid with a portion of the right eyelashes, the right eyebrow and the forehead could be picked up and pulled back exposing the bone of the forehead. In addition there was a flap of skin of the right forehead which was almost avulsed, beginning at the hairline and extending down toward the eye. From the initial examination it was felt the patient had sustained a cerebral concussion; severe lacerations of the face and scalp; blood loss resulting in shock. * *
Dr. Oliver, ophthalmologist, to whom plaintiff was referred by Dr. Moreland, stated in his report of examination the right eye revealed extensive scarring of both lids with greatest scar contracture involving the right upper lid at the junction of the inner and middle thirds. The lid did not fully close. He stated he was treating plaintiff conservatively and some improvement has been made, though grafting may yet be required.
Plaintiff was also referred to Dr. Hughes, a plastic surgeon, for treatment. He noted the following findings on physical examination:
“Revealed all cranial nerves to be intact. The eyelids function normally except for a small notch on the medial portion of the right upper eyelid. There-were no palpable fractures of the face. There were numerous scars of the face-causing considerable facial disfigurement. There was an irregular area of scarring located below the right eyelid, measuring two and one-half by one and one-half inches, there was a scar just anterior to the right ear measuring one inch in length and one-quarter inch in width. There was another scar running from the lateral side of the right eye to-the hairline measuring two and one-half inches in length. There was a three inch C shaped scar of the right forehead at the hairline with the concavity facing-the hairline. This created a large flap which was two inches in width. The area enclosed by the C shaped scar was elevated and approximately one-eight inch; higher than the surrounding tissue.. *914 There were two (2) one inch scars of the medial portion of the right eyelid and a small notch of the right eyelid. There was a three inch scar running from the medial portion of the right eyelid superi-orly toward the hairline. There was another three inch scar running from the medial portion of the left eyelid toward the hairline. There is also a one-half inch scar across the dorsum of the nose. All of these scars are irregular and at the present time are unsightly. The flap like scar of the forehead is the most noticable deformity.”
It is noted Dr. Hughes has made one surgical procedure at a cost of $100 which the trial court did not include in its award of special damages. This doctor stated three scar revisions are contemplated at a cost of $100 each.
From our appreciation of the doctor’s reports and descriptions of injuries and permanent disfigurement, and our appreciation of the photographs in the record of the extensive disfiguring scars shown to exist on the face of this young man, we find he is entitled to an additional award of $100 for past medical expenses and $200 for future medical expenses, and that the award of $7,500 of the trial court should he and is increased to $15,000.
For the reasons assigned, the judgment appealed from is amended by increasing the amount of the award to a total sum of $15,-979.30, and as amended, affirmed, and the casted defendants to pay all costs of these proceedings.
Amended and affirmed.